In the Matter of William K.
HOLMES, Debtor.

William K. Holmes, Plaintiff,

v.

James E. Perry and J.E. Perry
Farms, Inc., Defendants.

Bankruptcy No. 02–52793 RFH.

Adversary No. 02–5133.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Aug. 8, 2003.

Joseph J. Burton, Jr., Atlanta, GA, for Plaintiff.

Norman C. Pearson, III, Macon, GA, for Defendants.

### *MEMORANDUM OPINION*

ROBERT F. HERSHNER, Jr., Chief Judge.

William K. Holmes, Plaintiff, filed on May 7, 2003, a motion for summary judgment. James E. Perry, Jr.[1] (hereafter "Defendant") and J.E. Perry Farms, Inc. filed on May 8, 2003, a motion for summary judgment. The Court, having considered the motions, the record, and the arguments of counsel, now publishes this memorandum opinion.

Plaintiff's ancestors, around 1820, owned some 7,000 acres of land in Laurens County and Bleckly County, Georgia (hereafter the "Coley Place"). Parts of the Coley Place, over the years, were acquired by third parties.

Plaintiff's "dream" was to reassemble the Coley Place under his ownership and to develop a quail hunting plantation.

---

1. The caption of this adversary proceeding shows the name of this defendant as James E. Perry.

Plaintiff began acquiring parts of the Coley Place in 1985.

James E. Perry, Sr. is Defendant's father. Defendant's father owned a 368 acre tract (the "Perry Place")[2] located in Laurens County and Bleckly County. The Perry Place had been part of the Coley Place. Defendant farmed about one-half of the Perry Place.[3] The remainder of the Perry Place was timberland. Plaintiff wanted the buy the Perry Place. Plaintiff approached Defendant on a number of occasions over a number of years. Defendant declined to sell.[4]

Plaintiff sent the "Perry Family" a letter dated June 24, 1998, which states, in part: "It [the Perry Place] has become the most important physical thing in my life outside of my family. It will absolutely tear me up inside and break my heart if I'm not able to get it back into the old family land. This is not your fault, that is just the way it is. You are all absolutely fine people and that is why [I] am bearing my soul in my last desperate attempt to buy the land."

Plaintiff, in the letter, made a "cash offer" of $960,000 for the Perry Place. Plaintiff also offered to let Defendant take part or all of the sale proceeds in WorldCom stock.[5] Plaintiff offered to guarantee that the stock's value would double within three years. Plaintiff offered to "legally secure this guarantee". Plaintiff, in his deposition, testified that he, rather than Defendant, came up with the idea of offering WorldCom stock. Defendant again declined to sell.

Defendant, in the fall of 1998, decided to sell the Perry Place.[6] Plaintiff made a written offer dated January 22, 1999. Plaintiff offered to buy 35 acres[7] for $211,000 or the entire Perry Place, some 368 acres, for $1,110,000. Plaintiff's written offer stated that Defendant could take part or all of the sale proceeds in WorldCom stock and that Plaintiff would guarantee that the stock would double in value within three years. Defendant made a counteroffer to sell the 35 acres for $250,000 or the entire Perry Place for $1,500,000. Plaintiff decided to buy the entire Perry Place for $1,500,000.

Defendant's father held record title to the Perry Place. Defendant and his father consulted with an attorney and an accountant. They were advised that, for tax purposes, Defendant's father should convey title to the Perry Place to J.E. Perry Farms, Inc. Defendant's father and his wife owned one-half of the stock of J.E. Perry Farms, Inc. and would receive one-half of the sale proceeds, $750,000. Defendant and his wife, Edith W. Perry, owned the other one-half of the stock of J.E. Perry Farms, Inc. and would also receive $750,000.

Defendant decided to take $350,000 in cash and $400,000 in WorldCom stock.[8]

---

2. The Perry Place is also known as the White Place. The Perry Place may contain 367 acres rather than 368 acres.

3. Defendant, in his deposition, testified that he is a farmer and that he and his wife own a country store.

4. Although Defendant's father owned the Perry Place, Plaintiff dealt with Defendant.

5. Plaintiff owned a substantial amount of WorldCom stock.

6. Defendant, in his deposition, testified that he was concerned about his age and the agricultural economy.

7. Plaintiff may have offered to buy 25 acres rather than 35 acres.

8. Defendant's wife had an interest in J.E. Perry Farms, Inc. Defendant, however, made the decisions concerning the sales transactions at issue. Defendant, in his deposition, testified that he decided on the amount of

Plaintiff and Defendant had agreed to "cap the value" of the stock at $80 per share. Thus, Defendant and his wife would receive $350,000 in cash and 5,000 shares of WorldCom stock. Plaintiff agreed to guarantee that the value of the stock would double within three years. Plaintiff also agreed to secure his guarantee by giving Defendant and his wife a first priority deed to secure debt on the Perry Place. Plaintiff, in his deposition, testified that nothing prevented him from just saying "no" to the transaction other than his desire to acquire the Perry Place. Plaintiff also testified that he believed "the stock was going to go up and it [his guarantee] was going to be covered anyway".

Plaintiff was the sixth largest shareholder of WorldCom, Inc.[9] WorldCom stock was worth some $80 per share in March of 1999.[10]

The closing on the Perry Place occurred on March 10, 1999. Plaintiff's attorney handled the closing. Defendant's father signed a warranty deed conveying title to the Perry Place to J.E. Perry Farms, Inc. Defendant as president, and Defendant's wife as corporate secretary, signed a warranty deed conveying title to the Perry Place from J.E. Perry Farms, Inc. to Plaintiff. Plaintiff paid $1,500,000 for the Perry Place. Plaintiff's attorney, as the closing attorney, distributed from his es-

crow account, the sale proceeds to Defendant's father and his wife, and to Defendant and his wife.[11] Defendant then gave Plaintiff a check for $400,000 for 5,000 shares of WorldCom stock. Plaintiff telephoned and told his stock broker to transfer 5,000 shares of WorldCom stock to Defendant. Thus, Defendant and his wife received $350,000 in cash[12] and 5,000 shares of WorldCom stock.

Plaintiff signed a Conditional Guarantee Agreement dated March 10, 1999, in favor of Defendant and his wife. In the agreement, Plaintiff guaranteed that Defendant's WorldCom stock[13] would be worth at least $800,000 at some point between March 10, 1999 and March 9, 2002 (i.e. double in value within three years). If the stock failed to double in value, Plaintiff agreed to pay Defendant the difference between $800,000 and the "highest value for which [the stock] was traded at . . . on March 9, 2002." Plaintiff, in his deposition, testified that "the purpose of the whole concept when I brought it up was to guarantee him [Defendant] that the stock that he [Defendant] took would double in value. . . . All my intent was to guarantee him another $400,000." Defendant could sell any or all of his stock during the three year period without changing the guarantee agreement. Plaintiff secured his "pos-

stock he was going to accept on the day of the closing, March 10, 1999.

9. Plaintiff, in his first amended disclosure statement, states that he owned some 3.2 million shares of WorldCom stock. Plaintiff states that at one time his WorldCom stock had a value of close to $200 million. Plaintiff states that he was one of the largest shareholders until his stock was sold by foreclosure pursuant to a series of "margin calls" in late 1999 or early 2000.

10. *See* Plaintiff's statement of undisputed material facts, para. 11 (Docket No. 15, filed May 7, 2003).

11. Defendant, in his deposition, testified that he and his father "set aside" $380,000 of the sales proceeds to pay capital gains taxes.

12. Some $190,000 of Defendant's "cash" may have been "set aside" to pay capital gains taxes.

13. Although the WorldCom stock was owned by Defendant and his wife, Plaintiff and Defendant refer to the stock as Defendant's stock.

sible indebtedness" by giving Defendant and his wife a first priority deed to secure debt dated March 10, 1999 on the Perry Place. The Conditional Guarantee Agreement provides that it was "part of the inducement for the sale, conveyance and delivery" of the Perry Place.

Plaintiff signed a deed to secure debt dated March 10, 1999, in favor of Defendant and his wife. The deed to secure debt provides that Plaintiff is indebted to Defendant and his wife for $800,000 and that Plaintiff agrees to pay the same in accordance with the terms of the Conditional Guarantee Agreement. Defendant "required" the deed to secure debt as a necessary condition to close the sale. Plaintiff's attorney prepared the closing documents including the Consolidated Guarantee Agreement and the deed to secure debt.[14]

Plaintiff concedes that the deed to secure debt was properly executed and recorded in both Laurens County and Bleckly County.

Plaintiff began harvesting the timber on the Perry Place. Plaintiff asserts that he used a plantation cut to enhance quail hunting habitat. Plaintiff also made other improvements on the Perry Place.

WorldCom had financial problems.[15] Plaintiff, in turn, had financial problems.[16] Defendant's WorldCom stock failed to double in value. Defendant has not sold any of his WorldCom stock.

Defendant, in March of 2002, demanded that Plaintiff honor his Contractual Guar-antee Agreement that guaranteed that Defendant's WorldCom stock would double in value. Plaintiff was unable to perform and Defendant began foreclosure proceedings on the Perry Place. Plaintiff filed on July 1, 2002, a petition under Chapter 11 of the Bankruptcy Code to stop the foreclosure. Defendant and his wife filed a proof of claim asserting a secured claim in the amount of $746,364.38.

Plaintiff was able to acquire some 6,700 acres of land before he had financial problems.[17] James F. Lawton, MAI, a certified real estate appraiser, in his affidavit, testifies that, in his opinion, Plaintiff's 6,700 acres of land had a fair market value of less than $1,850 per acre as of March 10, 1999.[18] Plaintiff, in his deposition, testified that he paid more than fair market value for the Perry Place. Defendant, in his deposition, was unable to offer an opinion as to the value of the Perry Place as of March 10, 1999.

Plaintiff spent several millions of dollars reassembling the Coley Place and making improvements to develop his quail hunting plantation. Plaintiff and Defendant both are currently about 54 years old.

Plaintiff filed on August 15, 2002, a Complaint to Determine Validity, Priority and Extent of Liens and for Declaration Relief. Plaintiff urges the Court to determine that the Consolidated Guarantee Agreement and deed to secure debt on the Perry Place are void and unenforceable because Defendant received an amount substantially in excess of the fair market value for the Perry Place. Plaintiff also

---

14. Defendant's attorney may have prepared the warranty deeds.

15. WorldCom, Inc. filed a petition for Chapter 11 relief on July 22, 2002.

16. In his first amended disclosure statement, Plaintiff states that his financial problems began in late 1999 or early 2000.

17. Most of the 6,700 acres had been part of the Coley Place.

18. Mr. Lawton, in his affidavit, does not specifically address the value of the 368 acre Perry Place.

urges the Court to require Defendant to repay $736,000, which Plaintiff contends represents the difference between the sales price ($1,500,000) and the fair market value for the Perry Place. Defendant, on the other hand, urges the Court to determine that the Conditional Guarantee Agreement and deed to secure debt are valid and enforceable.

The Court notes that Defendant's wife is a party to the Conditional Guarantee Agreement and the deed to secure debt. Defendant's wife is not named as a defendant in this adversary proceeding. Plaintiff does not seek any relief against Defendant's wife.

The "strong arm" provisions of section 544(b)(1) of the Bankruptcy Code [19] provide that a "trustee may void any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 [of the Bankruptcy Code]".[20]

Plaintiff relies upon, as "applicable law," former Georgia Code Section 18–2–22(3) [21] which provides:

**18–2–22. Conveyances by debtors deemed fraudulent.**

The following acts by debtors shall be fraudulent in law against creditors and others and as to them shall be null and void:

. . .

(3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance.

Under § 18–2–22(3), Plaintiff must prove (1) the voluntariness of the deed or conveyance, (2) lack of a valuable consideration, and (3) insolvency of the debtor. *Dearing v. A.R. III, Inc.*, 266 Ga. 301, 466 S.E.2d 565, 566 (1996).

Plaintiff agues that the Conditional Guarantee Agreement and deed to secure debt were voluntary and without valuable consideration.

In *Stokes v. McRae*,[22] the Supreme Court of Georgia stated:

[A] voluntary conveyance or deed is one without any valuable consideration. *McDonald v. Taylor*, 200 Ga. 445, 449, 37 S.E.2d 336 (1946). A valuable consideration is founded on money, or something convertible into money, or having a value in money. *Hobbs v. Clark*, 221 Ga. 558, 146 S.E.2d 271 (1965).

278 S.E.2d at 395.

A deed without consideration, other than love and affection, is a voluntary conveyance. *Brown v. Citizens & Southern National Bank*, 253 Ga. 119, 317 S.E.2d 180, 183 (1984).

In *Brown*, the Supreme Court of Georgia stated:

The cases show that the word "voluntary" is not used in its ordinary sense, meaning "free choice" as opposed to "compelled". In fact, the word "voluntary" is used to mean "without valuable consideration". In *Bussell v. Glenn*, 197 Ga. 816, 818, 30 S.E.2d 617 (1944), it was

---

**19.** 11 U.S.C.A. § 544(b)(1) (West Supp.2003).

**20.** Plaintiff, as debtor in possession, has the rights and powers of a chapter 11 trustee. 11 U.S.C.A. § 1107(a)(West 1993).

**21.** O.C.G.A. § 18–2–22(3) (repealed July 1, 2002). This code section was in effect on the date the alleged fraudulent conveyances were

made. *Compare* O.C.G.A. § 18–2–75(a) (effective July 1, 2002) (transfer is fraudulent if debtor did not receive a reasonably equivalent value and was insolvent or became insolvent as a result of the transfer).

**22.** 247 Ga. 658, 278 S.E.2d 393 (1981).

held that a deed from a father to his daughters without consideration other than love and affection was a voluntary conveyance. In *Stokes v. McRae,* 247 Ga. 658, 659, 278 S.E.2d 393 (1981), the court stated: "We have held, as the subsection indicates, that a voluntary deed or conveyance is one without any valuable consideration."

317 S.E.2d at 183.

Thus, under § 18–2–22(3), the terms "voluntary" and "not for a valuable consideration" have the same meaning. Plaintiff must show that the Conditional Guarantee Agreement and deed to secure debt were made "without any valuable consideration."

Section 13–3–41 of the Georgia Code provides:

**13–3–41. Types of consideration.**

Considerations are distinguished into "good" and "valuable." A good consideration is such as is founded on natural duty and affection or on a strong moral obligation. A valuable consideration is founded on money or something convertible into money or having a value in money, except marriage, which is a valuable consideration.

O.C.G.A. § 13–3–41 (1982).

■ Plaintiff argues that he paid far in excess of the fair market value for the Perry Place. Plaintiff argues that the Conditional Guarantee Agreement and deed to secure debt were "voluntary" and "not for a valuable consideration" because Defendant received more than the fair market value for the Perry Place. Plaintiff argues that Defendant and J.E. Perry Farms, Inc. committed fraud or entered into a conspiracy by requiring the unreasonably high sales price.

The undisputed facts show that it was Plaintiff who suggested that Defendant take part or all of the sale proceeds in the form of WorldCom stock. Plaintiff offered to guarantee that the stock's value would double within three years. Plaintiff agreed to secure his guarantee by giving Defendant a deed to secure debt on the Perry Place. The Conditional Guarantee Agreement provides that it was "part of the inducement for the sale, conveyance and delivery" of the Perry Place. The Court can only conclude that Plaintiff's intention was to induce Defendant to sell the Perry Place. Defendant required the deed to secure debt as a necessary condition to close the sale. Plaintiff's attorney prepared the closing documents and handled the closing. Plaintiff could have said "no" to the transaction. Plaintiff agreed to all the terms of the transaction. The Court can only conclude that the sale was an arms length transaction.

The Court is not persuaded that the Conditional Guarantee Agreement and deed to secure debt were "voluntary" or "not for a valuable consideration". Plaintiff as a result of the transaction acquired the 368 acre Perry Place. The fact that he paid a high price for the land does not mean that Plaintiff did not receive something of value.

■ Plaintiff also must prove that he was "insolvent at the time of the conveyance." In *Goodman v. Lewis,*[23] the Supreme Court of Georgia stated:

The test for determining whether a debtor is insolvent, within the meaning of [§ 18–2–22(3)], is whether the value of his remaining property is sufficient to pay in full all of his debts. *Cohen v. Parish,* 100 Ga. 335, 28 S.E. 122 (1897). The value of the debtor's remaining property must be determined as of the date the conveyance sought to be set

**23.** 247 Ga. 605, 277 S.E.2d 908 (1981)

aside was made. *Ayers v. Harrell*, 111 Ga. 864(2), 36 S.E. 946 (1900).

277 S.E.2d at 909–10, n. 1

*See also Chambers v. Citizens & Southern National Bank*, 242 Ga. 498, 249 S.E.2d 214, 217 (1978). (debtor is insolvent under § 18–2–22(3) if remaining property is not ample to pay existing debts).

■ "One who is in debt may make a voluntary conveyance of a part of his property if the part retained is amply sufficient to pay his debts". *Wallace v. Williams* 212 Ga. 692, 95 S.E.2d 369, 372 (1956).

"The value of [the debtor's remaining] property is determined as of the date of the questioned conveyance". *Cavin v. Brown* 246 Ga.App. 40, 538 S.E.2d 802, 805 (2000), *cert. denied* (2001).

■ Plaintiff, in his statement of undisputed material facts [24], states:

20. [Plaintiff] was rendered unable to continue to pay his ongoing debts as they became due as a result of (i) said transfer of the Security Deed and (ii) the eventual foreclosure created and caused by Defendant Perry's attempted foreclosure of the Security Deed. [Plaintiff] has some of the same creditors at the time of the filing of this case (July 1, 2002), as he did at the time of the sale (March [10,] 1999), same being James Perry, Farmers and Merchants Bank, MBNA America, Bank of America, and State Bank of Cochran, among others....

21. The conveyance or transfer of the Security Deed to Defendant Perry left Plaintiff in a situation where he could not further pay Defendant Perry or others once Defendant Perry commenced foreclosure proceedings and demanded over Seven Hundred Thousand and No/100 Dollars ($700,000.00)....

The relevant date for determining Plaintiff's insolvency is March 10, 1999, the date of the alleged fraudulent conveyances.[25] Plaintiff does not allege that he was insolvent on March 10, 1999. The record shows that Plaintiff was very wealthy in March of 1999. Plaintiff, in his deposition, testified that he was spending "millions and millions" developing his quail hunting plantation. The Court is not persuaded that Plaintiff was insolvent on March 10, 1999.

The Court is not persuaded that Plaintiff, under O.C.G.A. § 18–2–22(3), can set aside as fraudulent conveyances the Conditional Guarantee Agreement and deed to secure debt.

Plaintiff argues that Defendant should have mitigated his damages when the price of WorldCom stock began to drop. Defendant has not sold any of his WorldCom stock.

The Consolidated Guarantee Agreement provides, in part, that Plaintiff would pay Defendant the difference between $800,000 and "the highest value for which [the stock] was traded at ... on March 9, 2002". The agreement provides that Defendant's election to sell part or all of his stock "shall not change the guarantee agreement described herein." Thus, Plaintiff's obligations under the Conditional Guarantee Agreement would not change whether or not Defendant sold his stock.

There being no questions of material fact, Defendant's motion for summary judgment on this issue will be granted.

**24.** Plaintiff's statement of undisputed material facts (Docket No. 15, filed May 7, 2003).

**25.** The Conditional Guarantee Agreement and the deed to secure debt are dated March 10, 1999.

Defendant urges the Court to determine that the proof of claim filed by Defendant and his wife for $746,364.38 is fully secured by the deed to secure debt on the Perry Place. *See* 11 U.S.C.A. § 506(a)(West 1993).

 The Court notes that this issue should be addressed through the claims objection process. Under section 502(a) of the Bankruptcy Code [26] Defendant's proof of claim is deemed allowed unless an objection to the proof of claim is filed.[27] Thus, the relief requested by Defendant is not properly before the Court and must therefore be denied. Accordingly, Defendant's motion for summary judgment will be denied on this issue.

An order in accordance with this memorandum opinion will be entered this date.

---

**26.** 11 U.S.C.A. § 502(a)(West 1993).

**27.** Fed. R. Bankr.P. 3007.